**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION OF LONDON**

| | | |
|---|---|---|
| EAGLE MINING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:14CV00105-ART |
| | ) | |
| ELKLAND HOLDINGS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**EAGLE'S OPPOSITION TO ELKLAND'S MOTION TO PARTIALLY VACATE**
**AND/OR MODIFY ARBITRATION AWARD**

Eagle Mining, LLC ("Eagle") opposes Elkland Holdings, LLC's ("Elkland") Motion to Partially Vacate and/or Modify Arbitration Award (the "Motion") **(ECF 21)**.

Elkland's Motion is procedurally defective and out of order. Elkland's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, in the Alternative, Motion to Transfer **(ECF 15)** is pending. This Court should deny Elkland's pending Motion to Dismiss **(ECF 15)**. Elkland will have a full opportunity to present its objections to the Arbitration Award at the appropriate time in this Action. To the extent it even considers Elkland's Motion, this Court should deny it because the Arbitrator made the Award based on the Contract Mining Agreement ("CMA"), the evidence presented, and the proper application of West Virginia law, well within the stringent standard of review.

**A.  Statement of the Case.**

Eagle filed its Demand for Arbitration in May 2013 asserting the index, Twilight Reserve "Long Haul," and permitting expense claims. **(ECF 1-2)**. Elkland filed Counterclaims. Elkland nominated Mr. Conover to serve as the arbitrator and Eagle agreed. The Arbitrator heard the fact

witnesses at a five day hearing in Lexington, Kentucky in January 2014. The parties presented expert witness testimony in February in Denver, Colorado. (Award of the Arbitrator, p. 2; Copy attached as Exhibit 1, **ECF 17-10** ¶¶ 4-7, 15, 17-20, Declaration of J. Scott Sexton).

Following the expert testimony in Denver in January 2014, the Arbitrator allowed post hearing briefs by both sides in response to specific written questions that he posed. The parties filed those briefs on February 21, 2014. A week later, Elkland filed a Motion to Strike two attachments to Eagle's brief along with associated argument. After a telephone hearing on March 5, the Arbitrator granted Elkland's motion and struck the material. Arbitrator Conover issued the Arbitration Award on March 18, 2014, well within the time period allowed by the AAA Rules. **(ECF 17-9, ¶¶ 21-22).**

In every respect, the Arbitration was well-conducted. The parties were well-represented; and counsel worked together with exemplary civility and professionalism. For his part, Arbitrator Conover was always prompt, courteous, attentive, intelligent and complimentary of the manner in which counsel for both sides handled the arbitration. (Arb. Tr. D. 8, pp. 97-98; copy of the Day 8 transcript pages attached as Exhibit 13; **ECF 17-9**, ¶24.

Cash-starved Eagle filed this Action on March 19, 2014, to confirm the Award. **(ECF 1)**. Elkland filed motions to dismiss for lack of personal jurisdiction and to transfer venue. **(ECF 15)**. Those motions have been briefed and were submitted to chambers for decision on May 20, 2014. Eagle intends to file a motion for summary judgment for entry of judgment on the Award upon this Court's action on Elkland's Motion to Dismiss.

### B.  Standard of Review

Elkland seeks to vacate or modify the Award. A district court's review of the Arbitrator's decision is "one of the narrowest standards of judicial review in all of American jurisprudence."

26309/2/6726802v1

Stonebridge Equity v. China Auto. Sys., Inc., 520 Fed. Appx. 331, 336 (6th Cir. 2013) (affirming confirmation of arbitration award) (quoting Lattimer-Stevens Co. v. United Steelworkers, Dist. 27, 913 F.2d 1166, 1169 (6th Cir. 1990)). See also Three S. Del. Inc. v. Dataquick Info. Sys., Inc., 492 F.3d 520, 527 (4th Cir. 2007) ("a district … court is limited to determin[ing] whether the arbitrators did the job they were told to do – not whether they did it well, or correctly, or reasonably, but simply whether they did it."). Any such review is limited, focusing solely on the Arbitrator.

The judicial vacatur of arbitration awards is exclusively limited to the four grounds stated in 9 U.S.C. § 10. Hall Street Assoc., LLC v. Mattel, Inc., 552 U.S. 576, 584 (2008). A district court may vacate an award only where: (1) the award was procured by corruption, fraud or undue means; (2) there was evident partiality or corruption by the arbitrator; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing upon sufficient cause, refusing to hear material evidence, or other prejudicial misbehavior; or (4) the arbitrator exceeded his powers, or so imperfectly executed them that a definitive award upon the matter submitted was not made. There is no basis for a district court to modify the Award by remittitur, except for the limited circumstances set forth in 9 U.S.C. § 11.

**1. Oxford Health Plans, LLC v. Sutter: The Supreme Court.**

The standard of review is focused within the four corners of the Arbitration Award. In Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2068 (2013), the Supreme Court restated the extraordinary standard of review that Elkland faces, stating:

> 'It is not enough to show that the arbitrator committed an error – or even a serious error.' Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even if arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits.  Only if 'the arbitrator acts outside the scope of his contractually delegated

3

> authority' --- issuing an award that 'simply reflects his own notions of economic justice' rather than 'drawing its essence from the contract' --- may a court overturn his determination. **So, the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.**

Id. (internal citations omitted; emphasis added). The Supreme Court applied this exacting standard with corresponding vigor:

> All we say is that convincing a court of an arbitrator's error --- even his grave error – is not enough.  So long as the arbitrator was 'arguably construing' the contract – which this one was – a court may not correct his mistakes under §10(a)(4).  The potential for those mistakes is the price of agreeing to arbitration.  As we have held before, we hold again: 'It is the arbitrators construction of the contract which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.'  The arbitrator's construction holds, however good, bad, or ugly.

Id. at 2070-1 (internal citations omitted).

### 2. **The Sixth Circuit**.

The Sixth Circuit has applied this standard of review in many cases. Martin Marietta Materials, Inc. v. Bank of Okla., 304 Fed. Appx. 360, 363 (6th Cir. 2008) (unpublished) ("[T]he question is not whether the arbitrator correctly construed the contract; it is whether he was 'arguably construing or applying the contract,' a requirement that most arbitration decisions will readily satisfy save for the rare situation where the decision is 'so untethered to the terms of the agreement … that it would cast doubt on whether the arbitrator indeed was engaged in interpretation.'") (affirming confirmation of arbitration award) (quoting Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M, 475 F.3d 746, 753 (6th Cir. 2007) (en banc)); Solvay Pharms., Inc. v. Duramed Pharms., Inc., 442 F.3d 471, 475 (6th Cir. 2006) ("[C]ourts must refrain from reversing an arbitrator simply because the court disagrees with the result or

4

believes the arbitrator made a serious legal or factual error.") (affirming confirmation of arbitration award); <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros</u>, 70 F.3d 418, 421 (6th Cir. 1995) ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrators must the award be set aside.") (affirming confirmation of arbitration award).

### 3. <u>The Eastern District of Kentucky</u>.

This Court applied this standard of review in <u>Appalachian Reg'l Healthcare, Inc. v. United Steel Workers Int'l</u>, No. 10-57-ART, 2010 U.S. Dist. LEXIS 12166, at *7 (E.D. Ky. Nov. 15, 2010). There, a hospital suspended a nurse after he was arrested for driving while intoxicated, and then fired him for delivering chili to co-workers during the suspension. <u>Appalachian Reg'l</u>, 2010 U.S. Dist. LEXIS 12166 at *2-4. The nurse challenged the discharge for lack of "just cause" as required by a collective bargaining agreement. <u>Id.</u> at *4. Pursuant to that agreement, the nurse's grievance was submitted to arbitration. <u>Id.</u> The arbitrator found that, although the nurse had violated the hospital's policy prohibiting insubordinate behavior, discharge was an inappropriate remedy. <u>Id.</u> at *5-6. The arbitrator ordered that the nurse be reinstated, but without back pay. <u>Id.</u> at *6. The hospital moved to vacate the decision, arguing that the arbitrator erroneously considered certain mitigating factors. <u>Id.</u>

This Court denied the motion to vacate. <u>Id.</u> at *13. "Courts evaluate arbitration awards under 'one of the narrowest standards of judicial review in all of American jurisprudence.'" <u>Id.</u> at *8 (quoting <u>Uhl v. Komatsu Forklift Co.</u>, 512 F.3d 294, 305 (6th Cir. 2008) (affirming denial of motion to vacate arbitration award)). "Reviewing courts do not consider the merits of an award, weigh the equities, or interpret collective bargaining agreements. Instead, courts must accord

5

great deference to the decisions reached by arbitrators." Id. (citing Champion Int'l Corp. v. United Paperworkers Intern. Union, 779 F.2d 328, 334 (6th Cir. 1985)). This Court further stated:

> [T]he parties bargained for this arbitrator's decision on the issue of [the nurse's] discharge and that is what they got. No more, no less. Thus, his decision is entitled to "extraordinary" deference and any "request for judicial intervention should be resisted even if the arbitrator made serious, improvident, or silly errors in resolving the merits of the dispute."

Id. at *9 (quoting Mich. Family Res., Inc. v. Serv. Employees Int'l Union Local 517M, 475 F.3d 746, 756(6th Cir. 2007) (en banc)).

In denying the motion to vacate, this Court emphasized the finality of arbitration decisions. "The arbitrator determined that [the hospital] did not have just cause to discharge [the nurse]. Period. *Finito*. Case closed. He took the question presented, answered the question, and sent the parties on their way." Id. at *7. This Court declined to revisit the arbitrator's decision-making process. "Whether he flipped a coin or provided the parties with a well-reasoned and thorough opinion (as he did here), the path he took in reaching that decision is not up for review when he answered the question presented and only that question." Id.

Elkland cannot meet its burden in this case.

### 4. **The Disfavored Manifest Disregard of the Law Standard.**

Even under the disfavored "manifest disregard of the law" standard (which is not stated in the FAA), proof is required evidencing the arbitrator's conscious proper understanding of the law and willful disregard thereof (i.e., he must *manifest* his intentional disregard). In 2008, the United States Supreme Court criticized this judicially created standard of review for exceeding the scope of the FAA. Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 584-5 (2008).

6

Since that time, the Sixth Circuit has questioned the continued viability of the manifest disregard standard. In Grain v. Trinity Health, 551 F.3d 374, 379-80 (6th Cir. 2008), the Sixth Circuit acknowledged previous cases using the terms "manifest disregard of the law," but cautioned that the phrase appears nowhere in the FAA enumerated forms of relief and the Supreme Court has recently explained that those enumerated grounds are "exclusive." Id. at 379 (suggesting that the terms "manifest disregard" may just be "shorthand" for the FAA enumerated grounds).

In Grain, however, the Court confirmed its prior ruling that the "manifest disregard of the law" standard can never be used to modify an arbitration award because the grounds for modification are limited to those enumerated in 9 U.S.C. § 11. Id. at 380 (citing NCR Corp. v. Sac-Co, Inc., 43 F.3d 1076, 1080 (6th Cir. 1995)). "NCR remains the law of this circuit and prohibits modifying an award based on an alleged 'manifest disregard' of law." See also, Ozormoor v. T-Mobile USA, Inc., 459 Fed. Appx. 502, 505 (6th Cir. 2012) (unpublished) ("There is some doubt as to whether this theory remains a cognizable one after Hall Street Associates … and T-Mobile at any rate does not challenge its applicability here [and] … it makes no difference to Ozormoor's request for relief.").

Even assuming the theory of review remains viable, under older Sixth Circuit decisions, it requires a legal finding by the arbitrator so outrageous that no judge could conceivably come to the same determination. Merrill Lynch v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995).

Setting aside the fact that this doubtful standard of review is extraordinarily difficult to satisfy, it obviously focuses on the award and the legal rulings of the arbitrator, not extrinsic evidence. Moreover, since it is clear that the Sixth Circuit does not allow modification or reformation of awards (except for the inapplicable grounds set forth in 9 U.S.C. § 11) much of

7

what Elkland is requesting in its current Motion is moot. In any event, there will be no trial, no discovery, and no evidentiary hearings.

Elkland's motion to vacate fails under this standard and only serves to delay the inevitable entry of judgment on the Award. Here, the Arbitrator filed a thirty-three page thoughtful decision that addressed every point raised at the Arbitration. Elkland prevailed on some of the claims and lost on some of the claims. But it cannot relitigate any part of this complicated dispute that was already decided by an attentive, experienced and talented Arbitrator ---- that **Elkland** selected. (**ECF 17-9**, ¶¶ 6-7.)

Arbitrator Conover diligently heard eight days of testimony. Elkland filed 146 pages of pre-hearing and post-hearing briefings, asserting the same arguments it now makes in its present Motion. (See **ECF 17-8**; Elkland's Prehearing Brief).[1] With two insignificant exceptions, Elkland's Motion simply attaches labels from 9 U.S.C. § 10(a)(4) ("exceeded his powers and/or so imperfectly executed them")[2] onto the Arbitrator's conclusions rejecting Elkland's previously briefed legal and factual positions; or, it alternately alleges that he "manifestly disregarded the law" by rejecting Elkland's proposed contract interpretations.

Elkland's Motion does not contest or seek to vacate the primary factual findings in the Award, nor does it contest the obvious conclusion that Arbitrator Conover's work product reflects his interpretation of the CMA. Elkland alleges no facts to show that Arbitrator Conover identified a clearly defined principle of law and then chose to disregard it. Accordingly, Elkland's multi-front attack on the Award seems designed simply to delay payment of the Award

---

[1] Elkland never requested summary judgment on any of the issues addressed in its current Motion.

[2] **ECF 21-1**, at pp. 12, 13, 14. Notably, Elkland's Motion never finishes the statutory sentence for 9 U.S.C. § 10(a)(4) – "…or so imperfectly executed them <u>that a mutual, final, and definite award upon the subject matter was not made</u>." (emphasis added).

while Eagle's creditors remain unpaid — as they have throughout Elkland's defensive campaign to "starve the village."

The Federal Arbitration Act provides that the Court must enter judgment upon the Arbitration Award. 9 U.S.C. § 9; Hall Street Assocs., 552 U.S. at 587. By its nature, such confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court. Professional Administrators, Ltd. v. Kopper-Glo Fuel, Inc., 819 F.2d 639, 642 (6th Cir. 1987) ("Arbitration is meant to be a quick and final resolution by which parties are bound. Moreover, an action to confirm the award should be a summary proceeding, not a proceeding in which the defendant seeks affirmative relief.").

In this case, when Eagle and Elkland were attempting to negotiate this dispute, Elkland declared impasse in a February 28, 2013 letter and directed Eagle to proceed with a demand for arbitration under CMA §26. (Arb. Ex. 392; Attached as Exhibit 16). Eagle followed this suggestion and filed its Demand for Arbitration in May 2013. **(ECF 1-2).** Eagle agreed to Elkland's nomination of Mr. Conover as the Arbitrator. Arbitrator Conover then presided over eight days of testimony and arguments and issued the 33 page Award of the Arbitrator. (Exhibit 1). Elkland, dissatisfied with the outcome, filed its current Motion. This Court should deny the Motion.

## C. Facts.

### 1. Eagle's Index Claim

#### a. Elkland's §7(c) defense: the index base period.

CMA §7(c) provides for quarterly index adjustments of the base price paid to Eagle for each ton of coal mined. Eagle expected that these adjustments would increase the price when Eagle's costs went up. (Arb. Tr. D. 2, pp. 16, 62) (Day 2 transcript pages attached as Exhibit 10).

9

On May 1, 2009, however, Ricky Bragg (Elkland) notified Eagle of a substantial price decrease to be paid to Eagle under CMA §7(c). (Arb. Ex. 25; Exhibit 2). In calculating the price decrease, Bragg incorrectly used the fourth quarter of 2008, rather than the first quarter of 2009, for the base index adjustment period; but he did not advise Eagle of this. (Exhibit 1 (Award), p. 5). Eagle did not understand the methodology for the price decrease, so it referred the matter to its accounting firm to investigate. (Exhibit 1, p. 5; Arb. Trs. D. 2, p. 64; D. 4, p. 58; Exhibits 10 and 11). On August 4, 2009, Eagle advised Keith Davis by email that it had assigned the "review, oversite and evaluation" of Elkland's index price adjustments to the accounting firm. (Arb. Ex. 27; Exhibit 3; Exhibit 1, p. 5). During this process, Ricky Bragg had two telephone calls and email exchanges with Eagle's accountants. (Arb. Tr. D. 1, pp. 258-60; Exhibit 9).

These communications related directly to the index claim. In November 2009, the accountants finished a report to Eagle explaining the problem ---- that Elkland was using the wrong base quarter and that there was a substantial price deficit as a result. (Arb. Exs. 333, 334; Exhibit 6 and **7**). Eagle provided this analysis to Keith Davis on November 17, 2009. (Exhibit 1 (Award), pp. 6, 11; Arb. Ex. 335; Arb. Tr. D. 2, pp. 71-74; Exhibits 8 and 10). By that time, both Keith Davis and Ricky Bragg knew that the CMA and its First Amendment both designated the first quarter of 2009, rather than the fourth quarter of 2008, as the base period for adjustments. (Exhibit 1, pp. 8-9). In response, on November 19, 2009, Keith Davis prepared and presented a proposed "Second Amendment" to Eagle to correct what he called an "error." Eagle refused to sign the proposed amendment on multiple occasions. (Exhibit 1, pp. 6, 9; Arb. Ex. 29; Arb. Tr. D. 2, pp. 74-76, 89, 97-98; Exhibits 4 and 10).

At the Arbitration, Elkland had an uphill battle in defending its fourth quarter 2008 index adjustment methodology against the plain language of CMA §7(c) that calls for use of the first

10

quarter of 2009. Elkland argued that §7(c) was ambiguous because it contained an error when it designated the first quarter of 2009.[3] Thus, Elkland proposed to introduce extrinsic evidence of the parties' intent contrary to the plain words of the CMA. (**ECF 17-8**; Elkland Prehearing Brief, p. 6). Eagle filed a Motion in Limine opposing Elkland's evidentiary request, but the Arbitrator denied it, allowing Elkland to present all of the evidence it wanted. Elkland presented evidence of the entire CMA negotiation process.

Extensive extrinsic evidence, which Elkland presented, contradicted Elkland's strained position including drafts of the CMA and a First Amendment to the CMA, all drafted by Elkland's experienced counsel, all containing the exact same "erroneous" language. Elkland's "error" evidence also included what the Arbitrator described as a "nail in the coffin" --- an additional executed amendment to the CMA from March <u>2012</u> confirming and ratifying all of the CMA terms (which Elkland now claimed to be in error). (Exhibit 1 (Award), p. 9, n.3; **ECF 17-19**).

### b. <u>Elkland's notice defense under §7(g).</u>

At the Arbitration, Elkland argued that Eagle waived its index claim because it did not give notice of its objection to Elkland's improper use of fourth quarter 2008 as the base period for index adjustments. Elkland attempted (with no success) to deny the obvious fact that Keith Davis prepared and proposed the "Second Amendment" **in response** to Eagle's complaints and the November 17, 2009 notice letter. Keith Davis testified that the proposed amendment was the spontaneous result of his independent reading of the CMA that occurred just two days after Eagle delivered the November 17, 2009 notice letter to Keith Davis with the attached report by

---

[3] The Arbitrator noted that Elkland did not seek reformation to conform the CMA to remove and replace the allegedly erroneous phrase. (Exhibit 1, p. 8).

the Kentucky accountant. Keith Davis denied receiving the November 17, 2009 letter. The Arbitrator rejected this incredible scenario.

The Arbitrator correctly found that "Eagle did succeed in conveying actual notice to Elkland of its objection to Elkland's unilateral interpretation … [that] culminated in Steve Davis' letter to Keith Davis of November 17, 2009, enclosing the results of the CPA review and concluding that the wrong base period was used." (Exhibit 1 (Award), p. 11; see also, Exhibit 1, p. 6: "Steve Davis of Eagle in turn delivered the Smallwood results to Keith Davis by letter dated November 17, 2009, which advised Elkland that 'there is a substantial deficit in payment'").[4] Elkland failed to carry its burden on this affirmative defense that Eagle had not given effective notice of the disputed issue. Eagle's calculations of index damages were uncontested. (Exhibit 1, p. 13). And, the result was an award on Eagle's index claim in the amount of $14,190,773.

### 2. **Eagle's Twilight Reserves Claim.**

Eagle also sought profits lost due to Elkland's directive not to mine the attractive "Twilight" coal reserves. Elkland requested that Eagle obtain a permit and mine these reserves, and then abruptly instructed Eagle not to mine this coal once the long-awaited permit was issued. (Exhibit 1, pp. 14-15; Arb. Ex. 62; Exhibit 5). The liability issue came down to the interpretation and application of CMA §16(b) to the business structure Elkland and Peabody selected. Elkland argued that its fear of being "linked" to the mining of these reserves (where it held the leases and had the exclusive right to receive all the coal), was a "condition … with respect to the operations or business of **[Eagle]**." (CMA §16(b)). The Arbitrator disagreed with Elkland's argument and found, as a matter of fact, that these corporate ownership issues created by Elkland "had nothing to do with the 'operations or business' of Eagle and do not allow Elkland to use Section 16(b) as

---

[4] Keith Davis's incredible version of the facts also conflicted with the facts recited by Elkland's expert, Dr. Barbaro. He reported that "**Eagle** raised the issue about the index base period in November 2009…" (Arb. Ex. 819, p. 15, ¶a; **ECF 17-39**).

a peg on which to hang its decision not to proceed with mining the Twilight Reserves." (Exhibit 1 (Award), p. 17). This finding resulted in a lost profits award of $8,955,038 in favor of Eagle. (Id. at 23).

### 3. Eagle's Long Haul, Permit Cost and Penalty Claims

Eagle asserted a claim for increased costs associated with extended hauling of spoil designed to preserve the value of coal reserves that Elkland acquired after the CMA was executed (the "Long Haul" claim). The Arbitrator agreed with Elkland's defenses and found that Eagle failed to sustain its burden of proof. (Exhibit 1, p. 25).

Eagle also asserted a claim for reimbursement of permit costs of $1,262,820 advanced by Eagle on behalf of Elkland for reserves not covered by the CMA (the "Permitting" claim). Elkland belatedly acknowledged responsibility for at least $236,710 of these costs at the Arbitration, and the Arbitrator awarded that amount, which remains unpaid. (Exhibit 1, p. 26).

Finally, the Arbitrator rejected Eagle's claim for damages associated with a train shipment that Elkland penalized for failure to meet specifications, finding insufficient evidence to rebut the testing data relied upon by Elkland. (Exhibit 1, pp. 27-8).

### 4. Elkland's claims for damages and specific performance.

Elkland asserted claims against Eagle for money damages associated with coal quality; but, it failed to present sufficient damages evidence and the Arbitrator rejected its claim. (Exhibit 1, pp. 28-9). Elkland prevailed on specific performance claims against Eagle for the transfer and assignment of mining permits; and Eagle has complied. (Exhibit 1, p. 29).

13

### D. The Arbitrator correctly decided Eagle's index claim.

#### 1. The Arbitrator rejected Elkland's technical notice defense.

Echoing its arguments before and during the Arbitration, Elkland asserts that the Award on the index claim should be vacated because the Arbitrator rejected Elkland's affirmative defense of inadequate notice under CMA §7(g). The Arbitrator correctly found that Eagle gave Elkland actual notice of Eagle's objection to Elkland's unilateral calculation of the index price adjustments. (Exhibit 1, p. 11). The Arbitrator correctly concluded, based on controlling West Virginia law, that Eagle's actual notice was sufficient even if CMA §7(g) applied to disputed index issue.

Arbitrator Conover held that the terms of CMA §7(c) are "clear and unambiguous and require that the base period of the first quarter of 2009 be applied in calculating the index price." (Exhibit 1, p. 7). Elkland does not seek to vacate the Arbitrator's interpretation of § 7(c). Similarly, Elkland does not seek to vacate the calculation of damages resulting from the proper application of §7(c).[5] Rather, Elkland argues only that Eagle made no effective notice of objection to the index methodology used by Elkland. On this point, Arbitrator Conover found to the contrary, as a fact:

> Perhaps more significantly, Eagle **did succeed in conveying actual notice** to Elkland of its objection to Elkland's unilateral interpretation and payment of invoices under the base index provisions. This notice commenced with Steve Davis' advising Ricky Bragg of his concern about the first two quarterly calculations, continued with Jim Moore's notice to Elkland that Eagle's CPA firm was reviewing, evaluating and auditing the Elkland calculations and culminated in Steve Davis' letter to Keith Davis [Elkland's Vice President] of November 17, 2009, enclosing the results of the CPA review and concluding that the wrong base period was used.

Exhibit 1, p. 11 (emphasis added). **Elkland does not seek to vacate this critical fact finding**.

---

[5] Eagle's calculations of index damages were uncontested. The Arbitrator awarded Eagle $14,190,773. Id. at 13.

26309/2/6726802v1

Under applicable West Virginia law,[6] **actual notice** to an officer of the company is sufficient contractual notice, notwithstanding technical notice terms embedded within a contract. Dixon v. Am. Indus. Leasing Co., 253 S.E.2d 150, 153 (W. Va. 1979) (construing contractual notice provisions in a lease dispute). In Dixon, the Supreme Court of West Virginia rejected a defense of inadequate notice holding, "the only purpose for the requirement of notice is to afford the one served with an opportunity to protect himself should he choose to do so…The record is replete with evidence that Beechurst [the tenant] had actual notice of the delinquency and of the termination of the lease." The West Virginia court applied a similar ruling in West Virginia v. Hatfield, 67 S.E.2d 529, 532 (W. Va. 1951) (actual notice sufficient in auction contract). Finally, under West Virginia law, a corporation "knows" what its officers and directors know. Caperton v. A.T. Massey Coal Co., 690 S.E.2d 322, 337 (W. Va. 2009). The Arbitrator's application of the actual notice holdings is obvious. (Exhibit 1 (Award), p. 11: "Eagle did succeed in conveying **actual notice** to Elkland…"). Eagle reviewed the controlling West Virginia actual notice cases in its prehearing and post-hearing briefs. Exhibit 14, pp. 51-2; Exhibit 15, pp. 32-3. Elkland's argument does not address the West Virginia decisions holding that actual notice is sufficient even if the actual notice does not meet the technical requirements of the contract.

### a. **CMA §7(g).**

Elkland does not challenge the Arbitrator's fact finding of actual notice (and actions based on that notice, such as Keith Davis' proposed Second Amendment). Thus, even though Elkland spent a great deal of the Arbitration hearing factually contesting "actual notice," its Motion focuses solely on its failed affirmative defense that Eagle did not comply with the

---

[6] CMA § 33 provides that West Virginia law governs.

technical notice requirement of CMA §7(g) (which it argues, contrary to West Virginia law, requires more than actual notice).

The notice provisions of §7(g) are tucked away in a section of the CMA entitled "Government Imposition." **(ECF 1-1, p. 11-12).** That section deals with adjustments to the Contractor's Base Price due to taxes or fees imposed by a government agency. Under this provision, Eagle is required to give notice to Elkland of any such changes, and Elkland will then make adjustments to the Base Price at its discretion. The sixty day notice provision is buried in this context without a paragraph break. The paragraph then states Elkland's right to set off any claims it has against any amounts due to Eagle. It is within this garbled context that the language appears stating that the Eagle is to "notify [Elkland] of the basis for the disagreement and the amount in dispute with as much specificity as possible within 60 days…" (Id. at 12). The Arbitrator found that Eagle gave notice, although not by serial letters to the unknown "president" of Elkland in Peabody's St. Louis world headquarters.

### b. <u>Eagle's arguments concerning the interpretation of CMA §7(g).</u>

During arbitration, Eagle responded to Elkland's argument by asserting that §7(g): (1) was ambiguous; (2) related only to reductions in payments such as penalties applied to invoices, etc. (i.e., disputes related to reduction of specific payments rather than systemic methodology disputes); (3) required only that Eagle "notify" (an act, not a document) Elkland of its dispute; and (4) did not control in any event under West Virginia law because Eagle gave Elkland actual notice of the dispute about Elkland's use of the wrong base period (and the amounts due thereunder could be calculated at any point in time by simply adjusting the base quarterly adjustment). (See Exhibit 15, Eagle Post-Hearing Brief, pp. 34-5). The Arbitrator considered arguments (1)-(3) above when he stated that the language of §7(g) seems "more to give Elkland

26309/2/6726802v1

notice of calculation or mathematical errors in the invoicing procedures set up by Elkland than it was to providing a required notice that its interpretation of the agreement did violence to the essential terms of the CMA." (Exhibit 1, p. 11). Elkland argues that the Arbitrator never found that §7(g) was ambiguous. To the contrary, the Arbitrator stated: "…it is not clear that Section 7(c) applies in this dispute." (Id., p. 11). This comment, read in context, suggests that the application of §7(g) to Eagle's Index Claim was not at all clear.

Nevertheless, the primary reason the Award states for rejecting Elkland's notice defense is that Eagle gave Elkland actual notice that included the accountants' monetary calculations and explanation of the dispute. (Id. at 6, 11). Accordingly, Elkland failed to carry its burden on this affirmative defense that Eagle had not given effective notice of the dispute. Based on this finding, the Arbitrator rejected Elkland's waiver and quasi-estoppel defenses. (Id. at 10-11). The Arbitrator also considered and rejected each additional affirmative defense raised by Elkland. (Id. at 8-9 (ambiguity) and 12 (industry custom and usage of trade and mutual mistake)).

Elkland argues that it relied on the finality of payments provided by §7(g) and that the Award undercut the finality of those payments. **(ECF 21-1, p. 9).** This argument fails because of the Arbitrator's express finding that Eagle gave Elkland actual notice of the index dispute. (Exhibit 1, pp. 6, 11). In the face of such actual notice, Elkland could not have relied on the finality of its underpayments as Elkland argues.

Elkland may disagree with the Arbitrator's conclusions, but there is no basis to allege that the Arbitrator manifestly disregarded applicable law. There is simply no allegation (or factual basis for such) that Arbitrator Conover refused to heed a clearly defined legal principle. Ozormoor v. T-Mobile USA, Inc., 459 Fed. Appx. 502, 506 (6th Cir. 2012) (unpublished) (declining to vacate arbitration award where petitioner failed to show that "the arbitrator

26309/2/6726802v1

consciously ignored 'clearly defined' legal authority in reaching his decision, as he must to establish a manifest disregard of the law"); Dawahare v. Spencer, 210 F.3d 666, 669 (6th Cir. 2000) ("[T]o find manifest disregard a court must find two things: the relevant law must be clearly defined and the arbitrator must have consciously chosen not to apply it.").

The closest Elkland can come (and it is not close at all) is to argue that Arbitrator Conover knew that §7(g) was in the CMA, knew Elkland proposed an interpretation of that section to require formal and specific notice to each contested invoice, knew that Eagle did not engage in such a constant stream of notices, and ruled against Elkland anyway. This argument is a far cry from the intentional disregard required under the standard of review. These allegations fail, particularly when considered in light of the Award and applicable West Virginia law.

Reading the Award makes it obvious that Arbitrator Conover was simply doing his job --- construing the CMA and applying his fact findings. This is precisely what is required, and precisely what the Supreme Court has held inviolable. Oxford Health Plans, 133 S.Ct. at 2068. The Arbitrator's analysis of the CMA §7(g) issue demonstrates that the Arbitrator made every effort to get the answer right, and did so, based on the facts (as he found them) and his correct understanding of West Virginia law.

### c.  Elkland's extrinsic evidence argument.

Elkland argues that the Arbitrator improperly speculated and considered extrinsic evidence in interpreting §7(g). **(ECF 21-1, p. 13).** This criticism stands in stark contrast to Elkland's own heroic efforts to alter the plain language of CMA §7(c) by reference to truckloads of extrinsic evidence. (**ECF 17-8**; Elkland's Pre-Hearing Brief, pp. 5-6, 12, 15, 24-31). More significantly, it is inconsistent with Elkland's effort to show through parol evidence that the confusing placement of the 60 day language in §7(g) was the result of "drafting error and/or

18

mutual mistake." <u>Id</u>. at 16.[7] Nonetheless, after expressing outrage that the Arbitrator would dare to look at the "extrinsic evidence" that <u>it</u> insisted on putting before him, Elkland then fails to identify such extrinsic evidence to support this allegation. Rather, it simply concocts this conclusion from the fact that Arbitrator Conover offered a different interpretation and application from the one proposed by Elkland. It is the job of every judge or arbitrator to construe and interpret the meaning and application of such clauses.

### d. Elkland's trivial argument that the Arbitrator "mistook" facts.

Without providing any context for how the facts are at all relevant (much less that the "record demonstrates strong reliance" on such <u>alleged</u> mistakes), Elkland also argues that the arbitrator mistook or created four facts. **(ECF 21-1, pp. 13-14)**. All things aside, these four minor "facts" are plainly not the foundation for the Arbitrator's ruling. Yet, the applicable legal standard cited by Elkland requires a "gross mistake … but for which, according to the arbitrator's rationale, a different result would have been reached." <u>Electronics Corp. of Am. v. Int'l Union of Electricians</u>, 492 F. 2d 1255, 1257 (1st Cir. 1974) (finding that the "sole articulated basis for [the arbitrator's] award was concededly in error.").

Elkland's argument is based on the self-serving parsing of the Award language and ignoring the evidence the Arbitrator considered. For example, Elkland alleges that neither party presented evidence that Jim Moore (Eagle) notified Keith Davis of concerns about the index adjustments on August 4, 2009.[8] **(ECF 21-1, p. 14).** In fact, Jim Moore sent Keith Davis an email on August 4, 2009 stating: "We are in review and audit of the index price adjustment for

---

[7] Elkland's Prehearing Brief to the Arbitrator promised that "the evidence will show that the fact that the dispute provision was moved to Section 7(g) was merely a drafting error or mutual mistake." **(ECF 17-8, p. 16, n. 10).**
[8] An irrelevant date in any event, because the Arbitrator found that Eagle gave notice that culminated with delivery of a November 17, 2009 letter and accounting analysis. (Exhibit 1, pp. 6, 11).

Q1 2009 and the proposed adjustment for Q2 relative to our contract arrangement." (Arb. Ex. 27; Exhibit 3). The actual evidence contradicts Elkland's allegation.

Elkland similarly alleges that there was no evidence that Steve Davis presented Ricky Bragg of concerns about the first two quarterly calculations. **(ECF 21-1, p. 14).** The evidence, however, established that: Ricky Bragg had discussions with Eagle's accountants in May 2009 about the index process (Arb. Tr. D. 1, p. 258; Tr. D. 5, p. 182; Exhibits 9 and 12); Keith Davis was aware of these discussions (Arb. Tr. D. 5, p. 41-2; Exhibit 12); and that Eagle and Elkland representatives discussed the index issue in August 2009 (Arb. Tr. D. 4, pp. 213-14; Exhibit 11).

Elkland also trivially alleges that Eagle did not have an internal accountant. **(ECF 21-1, p. 14).** The evidence, however, included detailed testimony about the accounting functions performed by Eagle employee Becky Knabenshue. Arb. Tr. D. 1, pp. 251-53, 278-83; Arb. Ex. 25; Exhibits 2 and 9.

Finally, Elkland argues that the Arbitrator made a mistake of fact when he stated that Ricky Bragg was contacted by representatives of Cloyd (Eagle's Kentucky CPA firm) inquiring about the index adjustments and he referred them to a subordinate Elkland accountant. Elkland argues that Ricky Bragg never referred anyone to a subordinate Elkland accountant. **(ECF 21-1, p. 14).**

The Arbitrator's minor comment on this point probably refers to Mr. Bragg's testimony at the end of Day 1. When asked about responding to contacts by Eagle's accountants, he said he called Becky Knabenshue (Eagle's internal accountant) and asked her to send the information. Mr. Bragg then stated: "I only talked to them guys twice, and then they sent me an email wanting the spreadsheet and the indices. And I just assumed they already had that, and I just wondered why they didn't get it from Becky or <u>someone from Elkland</u>." (emphasis added). (Arb. Tr. D. 1,

p. 276-7; Exhibit 9). Given Mr. Bragg's confusing reference to Elkland, the comment by the Arbitrator is understandable. In any event, this refers to a trivial factual detail.

Fundamentally, Elkland's quibbles regarding these preliminary exchanges ignore the key fact: Eagle delivered the November 17, 2009 notice letter and attached accounting analysis to Elkland. (Exhibit 1 (Award), pp. 6, 11). This letter alone establishes that Eagle gave Elkland actual and legally sufficient notice of the index dispute. The Arbitrator's discussion makes clear that Keith Davis' drafting of the proposed Second Amendment on November 19, 2009, and his subsequent actions, are explained only in the context of Eagle having given Elkland notice of the index dispute by delivering the November 17, 2009 notice letter and through prior communications. (Exhibit 1, p. 6, 9, 11). Elkland may disagree with the Arbitrator's fact findings, but such post-hearing disagreement does not establish any basis for vacating an arbitration award.

### e. The strict construction and evident partiality arguments.

Elkland makes weak arguments asserting "evident partiality" by the Arbitrator and his statements about strictly construing contract terms. **(ECF 21-1, pp. 14-16)**. The "strict construction" reference concerns Arbitrator Conover's rejection of Elkland's primary argument that CMA §7(c) was ambiguous or the result of a mutual mistake. The Arbitrator held that the terms were clear and unambiguous and then advised Elkland that ambiguities would be construed against it as the drafter in any event. (Exhibit 1, pp. 7-8). This is a secondary observation that the bolsters the primary finding that the language is clear and unambiguous.

Within this context, the Arbitrator pointed out that Elkland was a sophisticated party, represented by knowledgeable and experienced counsel.[9] (Id., p. 8). From this, Elkland then

---

[9] Elkland claimed scrivener error regarding CMA § 7(c)'s reference to "first quarter 2009," but failed to present any of its attorneys from Jackson Kelly, such as the lead attorney, Charles Loeb, to confirm the "error."

extracts its argument that Arbitrator Conover's correct description of Elkland as the subsidiary of a "dominant, old line coal company"[10] demonstrates "evident partiality." Allegations of "evident partiality" require "specific facts that indicate improper motives on the part of an arbitrator." <u>Uhl v. Komatsu Forklift Co.</u>, 512 F.3d 294, 306-07 (6th Cir. 2008). Elkland's allegations are far from the required mark.

Elkland's index argument really comes down to one thing -- it is offended that Arbitrator Conover was unpersuaded by its affirmative defense, even though Elkland had actual notice of Eagle's objections to Elkland's improper index calculations. Elkland may disagree with the Arbitrator's fact findings and contract interpretations, but the allegations in the Motion (and the attached Award) plainly show that he did exactly what he was hired to do. Elkland's Motion, therefore, fails to meet the requirements of <u>Oxford Health Plans</u>, <u>Solvay Pharms, Inc. v. Duramed Pharms, Inc.</u> and <u>Appalachian Reg'l Healthcare.</u>

### E.  The Arbitrator correctly decided theTwilight Reserves claim.

The Arbitrator awarded Eagle $8,955,038 on the Twilight Reserves claim. This claim involved lost profits caused when Elkland directed that Eagle obtain permits to mine the Twilight Reserves and Eagle complied. After the permit was issued, Elkland told Eagle that it could not mine the Twilight Reserves, relying on CMA §16(b). (Exhibit 1, pp. 14-16). Section 16(b) provides remedies for Elkland to object to bad conditions existing with the "operations or business" of Eagle; and allows Eagle thirty days to correct such conditions. **(ECF 1-1, p. 22)**. The Arbitrator concluded that the provisions of §16(b) did not authorize Elkland to prohibit Eagle from mining the permitted Twilight Reserves because Elkland's complaints related to a

---

[10] Peabody is the largest coal company in the world, and proudly proclaims this.

legally presumed "ownership and control" link caused by Elkland's corporate structure, not by Eagle's operations. (Exhibit 1, pp. 14, 18).

Elkland had changed its ownership structure for these coal reserves so as to both own the coal and have the exclusive right to receive the mined coal. (Id. at 14-15). These facts, not something related to Eagle's operations, triggered an *ipso facto* legal presumption that Elkland owned and controlled the operations. (Id. at 17; see, WVCSR § 38.2-2.85(d)(6)). The legal presumption, once detected by the West Virginia authorities, in turn caused Elkland's concerns that it would be deemed to have ownership or control. Arbitrator Conover correctly concluded that § 16(b) is directed at Eagle's operations, not Elkland's. Id. Since the problem cited was the result of Elkland's coal ownership structure, it could not be laid at the feet of Eagle as something that Eagle should correct within its operations. Id. Plainly, Eagle could do nothing to fix Elkland's corporate structure.

### 1. CMA §16(b).

Elkland swipes at the Arbitrator's interpretation of CMA §16(b), claiming that he should not have looked to the structure of Elkland's business operations in reaching his conclusions. First, Elkland asserts that he relied upon evidence of Elkland's business structure (and changes therein) in interpreting §16(b). **(ECF 21-1, p. 19)**. This premise is wrong. Arbitrator Conover interpreted the language of §16(b) and then applied the facts at issue. (Exhibit 1, pp. 16-17). Second, Elkland asserts that evidence of its coal ownership structure is "beyond the CMA and the facts of this case." **(ECF 21-1, p. 19)**. Even though there is no evidence that Arbitrator Conover considered such facts as the basis for his interpretation of § 16(b); the CMA provides that Elkland is the owner of the coal, always retains title to the coal, and has the exclusive right to receive the coal. **(ECF 1-1, Sections 1, 19)**. These facts are part of the CMA itself. It was

23

**Elkland** that asked Arbitrator Conover to receive evidence in this case regarding its prior corporate structure and agreements. **(ECF 17-8, pp. 12-13;** Elkland's Prehearing Brief; "Prior Mining and Contracts on the Cook Mountain Reserves."). Because of Elkland's introduction of this extrinsic evidence, the Arbitrator had to know that Elkland changed its operations structure in 2008. It was proper for Arbitrator Conover to consider such evidence in any event – because it explained the facts as to why the ownership and control link arose.

Elkland next argues that the Arbitrator looked at "hearsay evidence offered by Eagle" in applying §16(d). Elkland does not, however, identify what "hearsay evidence" the Arbitrator considered. **(ECF 21-1, p. 20).** If Elkland is referring to the information recited in the paragraph where it makes the comment, that evidence was presented by Elkland, not Eagle. (**ECF 17-8**; Elkland's Prehearing Brief, pp. 12-13). In any event, no case law supports the notion that an arbitrator's alleged consideration of hearsay testimony is grounds for judicial vacatur.

Elkland next argues that Arbitrator Conover should have stopped at the words in §16(b) that provide Elkland with the "sole discretion" to determine whether a condition with regard to Eagle's operations causes a threat to Elkland. **(ECF 21-1, p. 20).** For Elkland, these words negate the meaning of the remaining words in the paragraph. Simple sentence structure, however, indicates that any discretion provided to Elkland in this clause applies only to its assessment of danger, not to its ability to designate its own corporate structure as being part and parcel of how Eagle conducted <u>its</u> operations. Whether Eagle's operations included dangers caused by Elkland's business structures was an issue for the Arbitrator to decide --- and he did. This is precisely the type of decision an arbitrator makes that cannot be attacked under 9 U.S.C. §10 or 11.

26309/2/6726802v1

## 2. Elkland's Misbehavior Argument.

Elkland also fails in its attempt to impugn the Arbitrator for "misbehavior" in allowing Eagle to present evidence of its damages. (**ECF 21-1, pp. 21-3**). Its misplaced name-calling here relates purely to a matter of procedure, a category given even more deference on review. <u>Dobson Indus. v. Iron Workers Local Union No. 25</u>, 237 Fed. Appx. 39, 48 (6th Cir. 2007) (unpublished) ("Arbitrators are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration proceedings is merely whether a party has been denied a fundamentally fair hearing."); <u>Nationwide Mut. Ins. Co. v. Home Ins. Co.</u>, 278 F.3d 621, 625 (6th Cir. 2002) (same). Thus, "misconduct" or "misbehavior" under 9 U.S.C. § 10(a)(3) requires allegations and proof of <u>intentional</u> wrongdoing; a "mistake" is not enough to state a claim. <u>Questar Cap. Corp. v. Gorter</u>, 909 F.Supp. 2d 789, 816-17 (W.D. Ky. 2012) (arbitration panel's evidentiary exclusions were not "intentional" wrongdoings, absent clear and convincing evidence that the panel lacked a reasonable basis for these exclusions, and therefore did not amount to "misconduct" under § 10(a)(3)). No intentional misconduct is alleged here, nor could it be.

Elkland makes no meaningful allegation as to its rights that were actually prejudiced by any of this. It says only that "it was required to defend against a multi-million dollar damage escalation." But, it does not say that its defense was actually prejudiced in any manner – only that it related to a larger number than originally hoped. It acknowledges that Expert Stagg's report (calculating damages of $10,192,680) was disclosed timely on November 22, 2013, the same day that Elkland's expert report was disclosed. Arbitrator Conover correctly noted that the initial $3,800,000 figure in the Demand for Arbitration[11] is properly attributed only to Eagle's

---

[11] The Arbitration Demand (**ECF 1-2, at 17** ) states: "damages in the amount of <u>at least</u> $3,811,495.20, <u>or such other amount as may be shown at the arbitration of this matter</u> …"

counsel. (Exhibit 1, p. 20). In addition, the parties and the Arbitrator were aware that Eagle was still mining coal after it filed its Arbitration Demand. Eagle's damages, therefore, would not be fully assessed until mining was completed.

Elkland does not allege that Elkland or its expert failed to understand Stagg's calculation. In fact, the Award compliments Elkland's expert, Dr. Barbaro, for being "…granularly thorough in his critique of Mr. Stagg's report and model…" (Exhibit 1, p. 23). Elkland's expert testified that there were no lost profits associated with the Twilight reserves. (Exhibit 1, p. 22). If Elkland was surprised by an increased damage calculation when performed by an actual expert; then, certainly Eagle was surprised by Dr. Barbaro's opinion that the coal would have been mined at a loss (an allegation not contained within Elkland's Answer). **(ECF 21-4)**. Both sides received the expert reports on the exact same day – and neither side was prejudiced by Arbitrator Conover hearing the expert evidence. In this context, the Arbitrator had the authority to interpret and apply the AAA rules and his own scheduling order.

### F. Modification by Remittitur is not allowed under 9 U.S.C. § 10.

A district court is allowed to modify an award only on the limited grounds stated in 9 U.S.C. § 11. Elkland makes half-hearted arguments for downward "modification" of damages (i.e., remittitur) on both the Index Award (reduction to $3,298,699.96) and the Twilight Award (reduction to $3,811,495.20). **(ECF 21-1, pp. 16, 21-23)**. Elkland's Motion, however, makes no allegations to the grounds required for modification under 9 U.S.C. § 11, and no such grounds exist. The Motion, therefore, fails to assert proper grounds for modification and must be denied. NCR Corp. v. Sac-Co , Inc., 43 F.3d 1076, 1080 (6th Cir. 1995).

26309/2/6726802v1

### G.  Conclusion.

For the reasons stated above, Elkland's Motion fails in its attack on Arbitrator Conover and it should be denied summarily.

**Eagle Mining, LLC**

By: /s/ Gary W. Napier
   Counsel

Gary W. Napier
Drayer B. Spurlock
Napier & Associates, PSC
P.O. Drawer 5087
300 West Fifth Street
London, Kentucky 40745-5087
(606) 864-2263
gnapier@napierlawoffice.com
dspurlock@napierlawoffice.com

J. Scott Sexton (VSB 29284)
Gregory J. Haley (VSB 23971)
Gentry Locke Rakes & Moore, LLP
10 Franklin Road, SE, Suite 800
Roanoke, VA  24011
540.983.9300
540.983.9400 (fax)
sexton@gentrylocke.com
haley@gentrylocke.com

Counsel for Eagle Mining, LLC

26309/2/6726802v1

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of July, 2014, I filed the foregoing with the Clerk through the CM/ECF system, which will send notification to:

David A. Owen
Jason T. Ams
BINGHAM GREENBAUM DOLL LLP
300 W. Vine Street, Ste. 1100
Lexington, KY  40507

Counsel for Elkland Holdings, LLC

/s/ Gary W. Napier

26309/2/6726802v1